UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
UNITED STATES OF AMERICA,

              -against-

                                          03 Cr. 734 (DAB)
                                              OPINION

SUI MIN MA, a/k/a "Frank Ma," a/k/a
"Ma Gor," HOA DUC NGUYEN, a/k/a
"Ah Wah," LUYEN DAO NGUYEN, a/k/a
"Ah Wing," a/k/a "Ah Wren," WILLIAM
NAGATSUKA, a/k/a "Japanese William,"
BING YI CHEN, a/k/a "Ah Ngai," and
PAUL CAI, a/k/a "Arthur Tsoi,"

                    Defendants.
-----------------------------------X
DEBORAH A. BATTS, United States District Judge.

     Defendants Paul Cai ("Cai"), Bing Yi Chen ("Chen"), Sui Min

Ma ("Ma"), Luyen Dao Nguyen ("Dao Nguyen"), and Hoa Duc Nguyen

("Duc Nguyen"), have filed pre-trial motions.[1]  Specifically, Cai

moves for: dismissal of the Indictment based on lack of

jurisdiction; removal of the accomplice liability provision in

Count Four; preclusion of admission of co-Defendants' post-arrest

statements; severance; immediate production of additional

discovery; immediate disclosure of Brady, Giglio, and Jencks Act

material and 404(b) evidence; leave to make motions to suppress

evidence; and, finally, he moves for a bill of particulars.  Chen

_____

     [1] The Court notes that while it reviewed all of Defendants'
submissions in their entirety, counsel for Defendant Paul Cai,
without prior permission, submitted a 39-page Memorandum of Law
in Support of his motions, and counsel for Defendant Sui Min Ma
similarly submitted a 31-page Memorandum of Law in Support of his
motions, which are over this Court's page-limit of 25 pages; in
addition, Cai submitted a 25-page Reply Memoranda, which is over
this Court's page-limit of 10 pages.

moves for: an order dismissing the Indictment; for severance; an order suppressing statements; an order directing the Government to provide exculpatory evidence, discovery, information, and relevant material known to the Government; and he joins in any applicable co-Defendants' motions.  Ma moves for: an order requiring immediate production of all experts' reports and interview memorandum; an order compelling the Government to disclose all Brady and Jencks Act material; an order requiring the Government to preserve the rough notes and/or reports of all government agents; an order requiring the Government to provide all evidence it intends to use at trial, pursuant to Fed. R. Crim P. 12(b)(4)(B)[2]; an order directing the Government to disclose all alleged co-conspirator statements and to conduct a James hearing to determine their admissibility; an order to conduct a hearing to determine admissibility and audibility of recorded conversations and accuracy of transcripts; a bill of particulars; severance; he joins in any applicable motions filed by Co-Defendants; and he requests permission to file any necessary, additional motions.  Dao Nguyen moves to suppress his post-arrest statements.   Finally, Duc Nguyen moves for: an order directing the Government to disclose all alleged statements of individuals that are inconsistent or contradictory with prior statements made

---

[2] Defendant Ma incorrectly cites Fed. R. Crim P. 12(d)(2) in his brief.

by the individual, or with statements of others interviewed, or with the Government's theory of prosecution in its case against Duc Nguyen; an order directing the Government to disclose to him Fed. R. Ev. 404(b) material; and he joins in any applicable motions filed by co-Defendants.  The Government opposes these motions.

For the reasons that follow, Defendants' motions to dismiss the Indictment and to strike a portion of the Indictment are DENIED; Defendant Chen's motion for a suppression hearing is DENIED; Defendant Dao Nguyen's motion for a suppression hearing is GRANTED; Defendants' motions for severance are DENIED; Defendants' motions for preclusion of admission of co-Defendants' post-arrest statements are DENIED; Defendants' motions for bills of particulars are DENIED; Defendants' motion to conduct an audibility hearing is DENIED; Defendants' motions for an order requiring the Government to preserve rough notes and/or reports of all government agents are DENIED; Defendants' motions to direct the Government for early disclosure of all alleged co-conspirator statements are DENIED; Defendants' motions  for immediate production of all Brady material, Jencks Act material, expert reports, and Rule 404(b) evidence, and other discovery are DENIED; Defendants' motions for immediate production of early disclosure of expert reports are DENIED; Defendants' motions for leave to make motions to suppress evidence are DENIED; and

3

Defendants' motions for additional discovery are DENIED.

### I. BACKGROUND

On June 16, 2004, Defendants Ma, Duc Nguyen, Dao Nguyen, Nagatsuka, Chen, and Cai, were indicted by a federal grand jury on six counts.  (Indictment S4 03 CR 734.)

Count One charges Defendants Ma, Duc Nguyen and Dao Nguyen with racketeering conspiracy.  The three Defendants, along with Nagatsuka, Chen, Cai, and others known and unknown are alleged to be members and associates of a criminal enterprise known as the "Frank Ma Organization."  (Indictment ¶ 1.)  The Frank Ma Organization allegedly was an organized criminal group that operated in the Southern and Eastern Districts of New York, and the Central and Northern Districts of California, among other locations, which was engaged in, and its activities affected, interstate and foreign commerce.  (Indictment ¶ 2.)

Specifically, Ma allegedly was the leader of the Organization, who participated in the carrying out of unlawful activities in furtherance of the conduct of the Organization's affairs, including murder, robbery, heroin trafficking, transportation of stolen motor vehicles, alien smuggling, and illegal gambling.  (Indictment ¶ 3a.)  Duc Nguyen allegedly was one of the leaders of the Organization who reported directly to Ma, and who participated in carrying out unlawful activities in

furtherance of the conduct of the Organization's affairs, including murder, robbery, heroin trafficking, and transportation of stolen motor vehicles. (Indictment ¶ 3b.) Dao Nguyen allegedly was a member of the Organization, who reported to Ma and Duc Nguyen, and who participated in the carrying out of unlawful activities in furtherance of the conduct of the Organization's affairs, including murder and heroin trafficking. (Indictment ¶ 3c.)

The purposes of the enterprise included: enriching the leaders, members and associates of the Frank Ma Organization through, among other things, murder, heroin trafficking, robbery, transportation of stolen vehicles, alien smuggling and illegal gambling; preserving, protecting, and augmenting the power and financial profits of the Frank Ma Organization through the use of intimidation, threats of violence, and murder; and promoting and enhancing the Frank Ma Organization in the community, as well as its members' and associates' illegal activities, by identifying the Frank Ma Organization with intimidation, threats of violence, and murder. (Indictment ¶ 4.) The means and methods used by the leaders, members, and associates of the Frank Ma Organization to enrich themselves were the following: they committed murder, and conspired and attempted to commit murder in furtherance of the Organization's narcotics trafficking and other criminal activities; they engaged in narcotics trafficking; they committed

robberies, and conspired to commit robberies; they transported stolen vehicles in interstate and foreign commerce; they smuggled aliens, and conspired and attempted to smuggle aliens from the People's Republic of China (PRC) into the United States; they engaged in illegal gambling activities and operations; they promoted a climate of fear in their victims and the community through the threatened and actual use of force and violence, and through association with the Frank Ma Organization, to promote and expand the Organization's criminal activities and authority; and finally, they used and obtained firearms to carry out and further the Organization's illegal activities.  (Indictment ¶ 5.) The Indictment alleges that Defendants Ma, Duc Nguyen, and Dao Nguyen unlawfully, intentionally, and knowingly combined, conspired, confederated, and agreed together and with each other to conduct and participate, directly, and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  (Indictment ¶ 6.)

Count Two charges Defendant Ma with committing seven acts of racketeering. (Indictment ¶ 8.)  Those racketeering acts include: the murder of Harry Huang; heroin distribution; a double murder in Toronto; transportation of stolen vehicles; robberies of a computer company; illegal gambling; and heroin distribution. (Indictment ¶¶ 10-16.)

Count Three charges that Defendant Ma, and others known and

unknown, while engaged in a conspiracy to distribute one kilogram or more of heroin, and conspiracy to import one kilogram or more of heroin, in violation of 21 USC §§ 846 and 963, unlawfully, intentionally, and knowingly killed and counseled, commanded, induced, procured, and caused the intentional killing of Harry Huang on or about April 26, 1993. (Indictment ¶ 18.)

Count Four charges that Defendants Ma, Duc Nguyen, Dao Nguyen, Nagatsuka, Chen and Cai, while engaged in a conspiracy to distribute and possess with intent to distribute one kilogram and more of heroin and conspiracy to import one kilogram and more of heroin, in violation of 21 USC § 841(b)(1)(A) and 21 USC § 960(b)(1), with others known and unknown, unlawfully, intentionally, and knowingly killed and counseled, commanded, induced, procured, and caused the intentional killing of Kwan Kin Ming and Yip Pak Yin in Toronto, Canada, on or about July 20, 1994. (Indictment ¶ 20.)

Count Five charges that Defendant Ma, and others known and unknown, unlawfully, intentionally, and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States, and that as part of this conspiracy, Defendant Ma and others known and unknown distributed and possessed with intent to distribute a controlled substance, to wit, one and more kilograms of mixtures and substances containing a detectable amount of heroin. (Indictment

¶¶ 21-22.)  The Overt Acts associated with Count Five include
that Defendant Ma met with a nondefendant co-conspirator ("CC-1"), and discussed CC-1's willingness to help Ma distribute
heroin in the New York area in or about 1998; that CC-1 and
another nondefendant co-conspirator ("CC-2") arranged for the
sale of heroin in New York City in or about 1998 and 1999; and
that CC-1 and CC-2 traveled to China from New York to pay a
portion of their drug proceeds to Ma, as compensation for Ma's
assistance in arranging the purchase and sale of heroin by CC-1
and CC-2 in New York in or about 1999.  (Indictment ¶ 23.)

Count Six charges that Defendant Ma and others known and
unknown unlawfully, intentionally, and knowingly distributed, and
possessed with intent to distribute, one and more kilograms of
mixtures and substances containing a detectable amount of heroin.
(Indictment ¶ 24.)

At the first conference before the Court on July 14, 2003,
on Superceding Indictment Two, which charged only Defendants Duc
Nguyen, Nagatsuka, and Chen, the Government indicated that
discovery in the case consisted of physical evidence in Toronto,
paperwork from Toronto, and wiretaps from related cases.
(7/14/03 Trans. at 7-8.)  At the second conference before the
Court, on May 17, 2004, on Superceding Indictment Three, which
also charged Defendants Dao Nguyen and Ma, the Government
indicated that it had provided all discovery to Defendants.

(5/17/04 Trans. at 12.)  Because all of the Defendants were charged with capital-eligible crimes, the Court set a schedule at the second conference for Defendants to make mitigation submissions to the Government.  (5/17/04 Trans. at 10-12.) Superceding Indictment Four, which also charges Defendant Cai, was filed on June 16, 2004. On April 27, 2005, the Government informed Defendants and the Court that it had decided not to seek the death penalty against the Defendants.  A third conference was held before the Court on June 6, 2005, at which the Court set a motion schedule, the dates of which subsequently were adjourned by request of the parties until January 9, 2006.  Time has been excluded from the running of the Speedy Trial Act clock while these motions were pending, pursuant to 18 § 3161(h)(1)(F).

## II. DISCUSSION

### A. Motion to Dismiss Indictment

### 1. Lack of Subject Matter Jurisdiction

Defendant Cai moves to dismiss Count Four of the Indictment, because the Court lacks subject matter jurisdiction over the crime of an extraterritorial homicide of foreign nationals committed in a foreign country.  (Cai Mem. at 1.)  Cai argues that the statute with which he has been charged, 21 U.S.C. § 848(e)(1)(A), does not apply extraterritorially, based on Congressional intent, and, even if it does apply, its application

9

in the instant case violates international law.  (Cai Mem. at 2,

5.)  The Government argues that Cai and his co-Defendants

committed the crime with which they have been charged in the

United States, and furthermore, that Congress intended certain

criminal statutes to have "extraterritorial application,"

particularly drug smuggling and distribution statutes.  (Gov.

Mem. at 8-11.)

The statute in question, 21 U.S.C. § 848(e)(1)(A), which is

entitled, "Death penalty," states that:

> any person engaging in or working in furtherance
> of a continuing criminal enterprise, or any person
> engaging in an offense punishable under section
> 841(b)(1)(A) of this title or section 960(b)(1) of
> this title who intentionally kills or counsels,
> commands, induces, procures, or causes the
> intentional killing of an individual and such
> killing results, shall be sentenced to any term of
> imprisonment, which shall not be less than 20
> years, and which may be up to life imprisonment,
> or may be sentenced to death.

Section 841, in part, prohibits a person from distributing

and possessing with intent to distribute a kilogram or more of

heroin, and section 960, in part, prohibits a person from

importing more than one kilogram of heroin.

Cai argues that any connection to the United States is

tenuous, despite the fact that much of the preparatory acts of

the conspiracy took place in the United States, and despite the

fact that all the alleged participants traveled from the United

States.[3]  (Cai Mem. at 5-6.)  According to the Government, it has
evidence that shows that the Defendants discussed, planned, and
took substantial steps to commit the murder while in New York
City.  For example, according to the Government, Defendant Ma
told Cai and others in New York City that he wanted a person
killed in Canada to help his heroin distribution business, the
guns used in the murders were obtained in New York, and the van
used to drive to the murder scene was rented in New York.  (Gov.
Mem. at 13.)  The Court is convinced that because the preparation
for the murders took place in the United States, and the
underlying narcotics conspiracy took place in the United States,
the crime occurred in the United States, and the Court has
subject matter jurisdiction to hear the case.  Nevertheless, the
Court examines the question of whether the statute may be applied
extraterritorially.

Statutes that do not state otherwise are not presumed to
apply outside of the United States: "although there is no general
bar against the extraterritorial application of our criminal laws
to American citizens, the Supreme Court has long recognized a
presumption against such applications."  <u>United States v. Kim</u>,
246 F.3d 186, 188-189 (2d Cir. 2001) (citing <u>Sale v. Haitian</u>

---

[3] The Court notes that the two people murdered in Toronto
were not U.S. citizens, according to Defendants, a fact not
contradicted by the Government, and at the time of the murder,
according to Cai, he was not a U.S. citizen.  (Cai Mem. at 2.)

Ctrs. Council, Inc., 509 U.S. 155 (1993)); see also EEOC v.
Arabian Am. Oil Co., 499 U.S. 244, 248 (1991) ("It is a
longstanding principle of American law that legislation of
Congress, unless a contrary intent appears, is meant to apply
only within the territorial jurisdiction of the United States.")
(citation and internal quotation marks omitted); United States v.
Gatlin, 216 F.3d 207, 211 (2d Cir. 2000) ("[A]bsent 'clear
evidence of Congressional intent' to apply a statute beyond our
borders, the statute will apply only to the territorial United
States.") (quoting Smith v. United States, 507 U.S. 197, 204
(1993)).  This presumption against extraterritorial application
of jurisdiction applies to "crimes against private individuals or
their property, like assaults, murder, burglary, larceny,
robbery, arson, embezzlement and frauds of all kinds."  Gatlin,
216 F.3d 207, 211 (quoting United States v. Bowman, 260 U.S. 94,
98 (1922)).

     This extraterritorial presumption principle "can be overcome
when Congress clearly expresses its intent to do so."  United
States v. Yousef, 327 F.3d 56, 86 (2d Cir. 2003) (citing cases).
Generally, "Congress is presumed to intend extraterritorial
application of criminal statutes where the nature of the crime
does not depend on the locality of the defendants' acts and where
restricting the statute to United States territory would severely
diminish the statute's effectiveness."  United States v. Cohen,

427 F.3d 164, 168-169 (2d Cir. 2005) (quoting <u>Yousef</u>, 327 F.3d 56, 87).  In determining Congressional intent, a court is permitted to "consider all available evidence about the meaning of the statute, including its text, structure, and legislative history." <u>Kim</u>, 246 F.3d 186, 189 (quotations and citations omitted).

The text of 21 U.S.C. § 848(e)(1)(A) does not state that the statute applies extraterritorially, and the statute has not, to the Court's knowledge, been applied to a murder that occurred in another country.  Therefore, the Court must determine legislative intent regarding its extraterritorial application.

The statute makes it unlawful for persons while engaged in certain narcotics offenses to kill or participate in killing someone, meaning that the homicide must take place as part of a large-scale drug distribution, importation, or exportation offense.  It is obvious from the language of the statute and the statute's placement in Title 21, Chapter 13 of the United States criminal code, that Congress intended it to be a statute that criminalizes drug activities.

It is well established that Congress intends drug statutes to apply extraterritorially.  <u>See, e.g.</u>, <u>United States v. Cohen</u>, 427 F.3d 164, 168 (analyzing drug conspiracy laws and listing cases from various circuits where 21 U.S.C. § 846 or § 963 was applied extraterritorially).  Part of the reasoning behind

applying drug laws to crimes that occur in other countries, is
that drug activities outside the United States can have
repercussions within its borders.  See United States v. Orozco-
Prada, 732 F.2d 1076, 1087-1088 (2d Cir. 1984) (stating in the
context of someone intending to distribute drugs within the
United States, "The intent to cause effects within the United
States also makes it reasonable to apply to persons outside
United States territory a statute which is not expressly
extraterritorial in scope.") (quoting United States v. Muench,
694 F.2d 28, 33 (2d Cir. 1982)); see also Restatement (Third) of
the Foreign Relations Law of the United States §§ 402-403 (1987).

In a similar case, the Ninth Circuit found that 18 U.S.C. §
1959, which prohibits violent crimes in aid of racketeering
activity, applied to the murder of suspected Drug Enforcement
Agency (DEA) agents abroad, despite the fact that the statute
does not specifically state it applies extraterritorially.
United States v. Vasquez-Velasco, 15 F.3d 833 (9th Cir. 1994).
Vasquez-Velasco involved the murder of two U.S. citizens in
Mexico, who were mistaken for DEA agents by their killers.  15
F.3d at 837.  In examining the question of extraterritorial
application of the racketeering statute, the Ninth Circuit
compared the facts of the case to two other related cases, United
States v. Felix-Gutierrez, 940 F.2d 1200 (9th Cir. 1991), cert
denied, 508 U.S. 906 (1993) and United States v. Lopez-Alvarez,

970 F.2d 583, 586, 596 (9th Cir.). These cases involved the extraterritorial kidnapping, torture, and murder of a DEA agent and a confidential DEA informant, where the defendants were charged with being accessories-after-the-fact, in violation of 18 U.S.C. § 3, and where jurisdiction was found to exist. The Vasquez-Velasco court held that "because drug trafficking by its nature involves foreign countries and because DEA agents often work overseas, the murder of a DEA agent in retaliation for drug enforcement activities is a crime against the United States regardless of where it occurs." 15 F.3d at 841. The Vasquez-Velasco court concluded that extraterritorial application of § 1959 to violent crimes associated with drugs was reasonable under international law, and said, "Because drug smuggling is a serious and universally condemned offense, no conflict is likely to be created by extraterritorial regulation of drug traffickers." 15 F.3d at 841 (citing Restatement § 403, Rptr. n.8 (1987)). Although the victims in the instant case were not United States citizens, the drug-related murder in violation of § 848 similarly invokes application of the statute extraterritorially. Here, the Defendants allegedly traveled to Canada intending to murder someone on behalf of a drug supplier, potentially furthering their drug empire, and furthering their drug empire could potentially have an effect within the United States. Because Congress viewed § 848 as a statute that would combat the

15

country's pervasive drug problem, it can be assumed that, even without specific extraterritorial language in the statute itself, like other similar drug statutes, Congress intended § 848 to apply to homicides in other countries, as long as they are committed in furtherance of a drug crime.

Part of any analysis of Congressional intent to apply laws extraterritorially requires an examination of whether imposition of the law will violate international norms.  See United States v. Bin Laden, 92 F. Supp. 2d 189, 196 (S.D.N.Y. 2000) (stating that "courts that find that a given statute applies extraterritorially typically pause to note that this finding is consistent with one or more of the five principles of extraterritorial jurisdiction under international law," and also stating that courts generally presume when determining whether a statute applies extraterritorially, that "in the absence of an explicit Congressional directive, courts do not give extraterritorial effect to any statute that violates principles of international law.") (quoting Vasquez-Velasco, 15 F.3d 833, 839).  The Second Circuit stated in United States v. Yousef that when determining whether Congress intended a particular statute to apply extraterritorially, "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."  327 F.3d 56, 86 (citing McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 21

(1963) (quotations omitted).  The Second Circuit went on to state in <u>Yousef</u>, "Nonetheless, in fashioning the reach of our criminal law, Congress is not bound by international law.  If it chooses to do so, it may legislate with respect to conduct outside the United States, in excess of the limits posed by international law." <u>Id.</u> (quotations and citations omitted).

No international principles here have been violated.  Several members of Congress expressed concern regarding the death penalty provision of the statute during its formation, and many members discussed their specific concerns about other countries' responses to the passage of a law with the penalty of death.  <u>See, e.g.</u>, 134 Cong. Rec. H11108, H11251 (daily ed. Oct. 21, 1988) (statement by Rep. Fazio that, "the imposition of the death penalty will undermine U.S. efforts to go after drug kingpins operating overseas because, according to federal prosecutors and state department legal experts, the vast majority of countries will not agree to extradite any of their citizens to a nation where they face the prospect of the drug penalty.").  The Court recognizes that the death penalty is in conflict with the views of a majority of civilized nations,[4] however, extraterritorial

_____

[4] <u>See, e.g.</u>, Richard J. Wilson, International Law Issues in Death Penalty Defense, 31 Hofstra L. Rev. 1195, 1210 (2003) ("Recent reports from the United Nations show that about two-thirds of the countries of the world have abolished capital punishment, and the trend in the last decade has been strongly toward abolition, not expansion or re-adoption."); Amnesty International, Facts and Figures on the Death Penalty, available

jurisdiction may be found under several principles of international law.

For example, extraterritorial jurisdiction may arise under the "objective territoriality principle," and under the "protective principle."  See Yousef, 327 F.3d 56, 91, n.24.  The objective territoriality principle provides that a country has jurisdiction to prosecute laws with respect to "conduct outside its territory that has or is intended to have substantial effect within its territory."  Bin Laden, 92 F. Supp. 2d 189, 195 (quoting Restatement (Third) of the Foreign Relations Law of the United States § 402(1)(c) (1987)).  The "protective principle" provides that a state has jurisdiction over "certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests."  Bin Laden, 92 F. Supp. 2d 189, 195-196 (quoting Restatement (Third) of the Foreign Relations Law of the United States § 402(3)); see also Yousef, 327 F.3d 56, 91, n.24; United States v. Peterson, 812 F.2d 486, 493-494 (9th Cir. 1987) ("Protective jurisdiction is proper if the activity threatens the security or governmental functions of the United

_____

at http://web.amnesty.org/library/nidex/ENGACT500082004 (last updated April 6, 2004) (stating that 122 countries have abolished the death penalty in law or practice, and that in 2004, 97 percent of all known executions took place in China, Iran, Viet Nam and the United States).

States. . . . Drug trafficking presents the sort of threat to our nation's ability to function that merits application of the protective principle of jurisdiction.") (citation omitted).

Both of these jurisdictional principles are relevant here. Because § 848(e)(1)(A) includes the commission of a predicate offense involving drug-related conduct, a violation of the statute necessarily involves extraterritorial drug-related conduct. As discussed, drug-related crimes have been found to have substantial effects within United States territory, thus comporting with the objective territoriality principle. The Court also finds that because drug trafficking, which is included in the statute, presents a "threat to our nation's ability to function" (see Peterson, 812 F.2d 486, at 494), the protective principle of jurisdiction also is applicable. Therefore, criminal actions, even murder on foreign soil, which are taken in furtherance of a drug crime, are properly prosecuted in the United States.

Accordingly, because the Court finds the statute under which Defendant Cai and his co-Defendants were charged in Count Four is a narcotics statute, Congress intended for it to have broad applicability beyond our borders, which is in keeping with extraterritorial jurisdiction requirements. Therefore, Defendant Cai's motion to dismiss Count Four of the Indictment is DENIED.

## 2. Accomplice Liability

Defendant Cai moves to strike the reference to 18 U.S.C. § 2 in Count Four, because he claims that the general accomplice liability provision does not apply.[5]  (Cai Mem. at 9.) Specifically, Cai argues that Congress did not intend for 18 U.S.C. § 2 as a whole to apply automatically to 21 U.S.C. 848(e)(1)(A), because Congress specifically chose to include only part of 18 U.S.C. § 2 in 21 U.S.C. § 848(e)(1)(A), and it chose not to include the § 2 aiding and abetting language.  (Cai Mem. at 10-11.)  The Government counters that the Second Circuit previously addressed and disposed of Cai's argument in <u>United States v. Walker</u>, 142 F. 3d 103 (2d Cir. 1998). (Gov. Mem. at 31.)

Examining the language of the statute, the court in <u>Walker</u> found that unlike other sections of 21 U.S.C. § 848, subsection 848(e)(1)(A) "expressly includes language of aiding and abetting liability," which means a defendant may be held liable for violation of § 848(e) as an aider or abettor.  142 F.3d at 113.

---

[5] 18 U.S.C. § 2, which is titled, "Principals," states:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

The court also examined § 848(m), which provides mitigating factors applicable to § 848(e), one of which is that "the defendant is punishable as a principal (as defined in section 2 of Title 18) in the offense, which was committed by another, but the defendant's participation was relatively minor." 21 U.S.C. § 848(m)(3). The court found that the inclusion of this language from § 2 indicated a clear intention to include liability for aiding and abetting. 142 F.3d at 113. Accordingly, Defendant Cai's motion to strike the reference to 18 U.S.C. § 2 in Count Four is DENIED.

### 3. Prejudicial Delay

Defendant Chen moves to dismiss the Indictment against him because the Government's pre-accusatory delay denied him of his right to due process in violation of the Fifth Amendment to the U.S. Constitution, or, in the alternative, moves for the Court to conduct a hearing to determine the cause of the pre-indictment delay and the alleged prejudice resulting from the delay. (Chen Mem. at 5.) The Government opposes this request because Chen fails to indicate how he has been prejudiced in any way. (Gov. Mem. at 25.)

Whether an indictment should be dismissed due to pre-indictment delay depends upon the type of prejudice that results from such delay. See United States v. Marion, 404 U.S. 307, 321-22 (1971) (distinguishing actual and potential prejudice and

characterizing the passage of time that may impair memories, cause evidence to be lost, and deprive the defendant of witnesses as "a possibility of prejudice"). For claims of potential prejudice, the applicable statute of limitations is the primary guarantee against bringing overly stale criminal charges. Id. at 322. Where actual prejudice is alleged, for example, actual loss of evidence or the unavailability of witnesses, the Due Process Clause of the Fifth Amendment may provide protection to a criminal defendant even when an indictment is filed within the applicable statute of limitations. Id. at 324.

The Due Process Clause requires dismissal of the indictment where the defendant demonstrates that the pre-indictment delay caused substantial prejudice to the defense and that the delay was an intentional device to gain a tactical advantage over the accused. Id. This kind of delay violates the Due Process because "such conduct departs from fundamental notions of 'fair play.'" United States v. Cornielle, 171 F.3d 748, 752 (2d Cir. 1999) (quoting United States v. Lovasco, 431 U.S. 783, 795 (1977)). The burden of the Defendant to prove both elements is a heavy one. Cornielle, 171 F.3d at 752; see also United States v. Scarpa, 913 F.2d 993, 1014 (2d Cir. 1990). In sum, "timely brought criminal prosecutions are only rarely dismissed." Cornielle, 171 F.3d at 752; see also Lovasco, 431 U.S. at 789 (stating that the Due Process Clause has only "a limited role to

play in protecting against oppressive delay").  To state a Due
Process claim, the proof of actual prejudice must be definite and
not speculative.  See United States v. Birney, 686 F.2d 102, 105-
06 (2d Cir. 1982) (stating that defendant must "'demonstrate how
[the loss of evidence] is prejudicial'") (quoting United States
v. Mays, 549 F.2d 670, 677 (9th Cir. 1977)); see also United
States v. Wallace, No. 97 Civ. 975, 1998 U.S. Dist. LEXIS 10874,
*37, 1998 WL 401534, at *12 (S.D.N.Y. July 17, 1998)
(characterizing the actual prejudice standard as "fairly
stringent").

        The Government argues that the Complaint provides
substantial detail about Chen's role in the offense charged, and
further argues that the Government has provided him with
"thousands of pages of photographs, documents and other material
that set forth significant additional details about the murder."
(Gov. Mem. at 25, 26 n.9.)  Chen replies that the passage of
time alone has eliminated any reasonable possibility of his
presenting a defense, because important information and documents
are no longer available, and because of Chen's "natural
diminution of memory over the course of the last decade."  (Chen
Reply at 2.)

        Defendant Chen has failed to meet the heavy burden of
showing substantial prejudice and intentional delay by the
Government.  Defendant alleges no actual substantial prejudice,

beyond speculative notions of poor memory and lost evidence. Furthermore, although a significant amount of time has passed since the crimes allegedly occurred and the Indictment was filed, Defendant has not shown that the Government delayed the filing of the Indictment for its own tactical advantage. Accordingly, the Court DENIES Defendant Chen's motion to dismiss the Indictment for prejudicial pre-indictment delay in violation of the Due Process clause. Because of this finding and the fact that the Government has turned over significant discovery materials, the Court further finds that a hearing is not necessary.

    4. Double Jeopardy

    Defendant Chen moves for Count Four to be dismissed against him because it violates the double jeopardy clause of the Fifth Amendment to the U.S. Constitution.[6] (Chen Mem. at 17.) Chen claims that the instant Indictment is the "third in a series of prosecutions against him which involve many of the same offenses, the same organizations, and the same codefendants." (Chen Mem. at 17.) The Government opposes this motion as meritless, and argues that any crimes Chen pled guilty to previously are different than the instant crime charged. (Gov. Mem. at 28.)

    The Government alleges, and Chen does not refute, that Chen

---

    [6] The Fifth Amendment's Double Jeopardy Clause states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., Amend. V.

pled guilty in the Eastern District of New York to Indictment 96-374 in or about October of 1998, which charged him with conspiring to distribute heroin between February 1, 1996 and March 5, 1996, in violation of 21 U.S.C. § 846; and he pled guilty in or about September 2002 in the Northern District of California to Information 96-0094, which charged him with a violation of RICO, and which contained two racketeering acts: conspiracy to distribute heroin between January 1995 and April 9, 1996, and distribution of 680 grams of heroin on or about March 5, 1996. (Gov. Mem. at 28-29.) The instant case charges Chen with participating in a murder that took place on July 20, 1994, while engaged in a narcotics conspiracy that took place from in or about 1993, up to and including in or about July 1994. (Gov. Mem. at 29.)

As the crimes charged in the instant case pre-date the crimes charged in the prior Indictment and Information, Chen has not been charged here with the same offenses charged in any previous cases. Accordingly, the Court DENIES Defendant Chen's motion to dismiss the Indictment on double jeopardy grounds.

B. Motion to Suppress Post-Arrest Statements

Defendant Chen moves to suppress a statement made by him in violation of the Fifth and Sixth Amendments to the U.S.

Constitution, <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and 18 U.S.C. § 3501. (Chen Mem. at 13.) According to FBI FD-302 form, attached to Chen's motion papers, two FBI agents arrested and interrogated Chen while he awaited deportation in Eloy, Arizona on June 2, 2003. (Chen Notice of Motion, Ex. 1.) The form also indicates that Chen waived his Miranda rights by signing an FD-395 form. (Id.) According to Chen, who understands limited English, "upon information and belief," the waiver form was entirely in English and was not translated into Chinese. (Chen Mem. at 13.) Furthermore, according to Chen, the FBI agents failed to inform him of the Indictment against him. (Chen Mem. at 14-15.) The Government opposes Chen's motion, arguing that Chen was advised of his rights in Chinese and English. (Gov. Mem. at 35.) The Government also correctly points out that in his moving papers, Chen did not include an affidavit with personal knowledge, however, Chen does include a two-paragraph affidavit in his reply papers, which states that the agents who took him into custody told him they had an arrest warrant for him. (Chen Reply, Ex. 1.) He does not recall whether they showed him the warrant, and he does "not recall seeing the complaint or being shown its contents." (Chen Reply, Ex. 1.) Chen also states in his affidavit that he was not informed he had been indicted in this case. (Id.)

Defendant Dao Nguyen moves to suppress statements he made

before and after he executed a written waiver of his rights, in violation of his Fifth Amendment Due Process rights, because his statements were coerced.[7]  (Dao Nguyen Letter at 1.) Specifically, Dao Nguyen alleges he was questioned by agents before being notified of his rights, and that he was coerced into signing a waiver of his rights because the interrogating agents threatened to kill his dog and arrest his wife, and because of his concern for the welfare of his two children.  (Dao Nguyen Letter at 3; Dao Nguyen Aff. ¶¶ 2, 3.) The Government consents, in an abundance of caution, to an evidentiary hearing, at which it expects to establish Dao Nguyen's statements were made knowingly and voluntarily after he had properly waived his Miranda rights.  (Gov. Mem. at 37.)

An evidentiary hearing is normally required in motions to suppress where a factual issue is in dispute.  See United States v. Fruchter, 104 F. Supp. 2d 289, 308 (S.D.N.Y. 2000) ("A motion to suppress does not require a hearing unless there is a factual

_____

[7] The Court notes that Dao Nguyen's attached affidavit is unsigned, and furthermore, his motion is in the form of a letter to the Court, in violation of the policies and procedures for Electronic Case Filing (see www.nysd.uscourts.gov/cmecf/policies/ecf_policies_procedures.htm) and thus was never formally filed with the Court, and does not appear on the docket.  The Court further notes that it was never provided with a copy of the document, despite repeated requests to Defense counsel, and in fact only was made aware of its existence by the Government, which provided a copy to the Court. The Clerk of the Court is directed to accept the attached letter brief and docket it.

dispute") (citing <u>United States v. Pena</u>, 961 F.2d 333, 339 (2d Cir. 1992)); <u>see also United States v. Mathurin</u>, 148 F.3d 68, 69 (2d Cir. 1998) (holding that an assertion by a defendant when the Government asserts the contrary creates a specific factual dispute that must be resolved with an evidentiary hearing). However, where no factual issue is presented, no hearing is necessary. <u>See United States v. Gillette</u>, 383 F.2d 843, 848 (2d Cir. 1967) (holding that where no factual issue was presented in the form of personal knowledge, "the denial of a hearing was correct"). The moving papers requesting an evidentiary hearing must be "sufficiently definite, specific, detailed and nonconjectural" as to indicate relevant contested issues of fact. <u>Pena</u>, 961 F.2d 333, 339 (citations and internal quotations omitted); <u>see also United States v. Watson</u>, 404 F.3d 163, 167 (2d Cir. 2005). Furthermore, such moving papers must be made "through an affidavit of an individual with personal knowledge of the relevant facts." <u>United States v. Nelson</u>, 335 F. Supp.2d 477, 478 (S.D.N.Y. 2004) (citing <u>Gillette</u>, 383 F.2d 843, 848-49; <u>United States v. Viscioso</u>, 711 F. Supp. 740, 745 (S.D.N.Y. 1989)).

The Second Circuit held in <u>United States v. Charria</u> that "giving an indicted defendant Miranda warnings is sufficient to make 'knowing and intelligent' his waiver of the sixth amendment right to counsel, even if the defendant has not been expressly

informed of the indictment pending against him." 919 F.2d 842, 848 (2d Cir. 1990); see also United States v. Sawinski, No. 00 Cr. 499, 2000 U.S. Dist. LEXIS 13283, at *23 (S.D.N.Y. Sept. 20, 2000).

Whether Chen was informed of the Indictment filed against him or not, he does not dispute that he knew he was under arrest, and in his affidavit he does not dispute that he was properly informed of his rights in English and Chinese. Therefore, no facts are in dispute, and no hearing is necessary. Chen's motion to suppress any statements is DENIED.

As to Dao Nguyen, he has raised a factual dispute, because he alleges in his affidavit that he was coerced into signing a waiver of his rights, and therefore did not voluntarily answer the agents' questions, which contradicts the Government's statement of events. Accordingly, Dao Nguyen's motion for a suppression hearing is DENIED. A hearing shall take place on April 11, 2006 at 11 a.m..


C. Motion to Sever

Defendant Chen moves for an order of severance of the charge against him from the other charges in the Indictment, pursuant to Fed. R. Crim. P. 14. (Chen Mem. at 9.) Chen argues that while he is charged only in Count Four, three other counts (One, Two,

and Five) include prejudicial allegations against him, and two other counts (Three and Six) charge crimes of violence and drugs against Defendant Ma, who is Chen's co-Defendant and alleged co-conspirator in Count Four. (Chen Mem. at 9.) Chen argues that admitting the other charges and associated evidence will prejudice the jury against him and deny him a fair trial. (Chen Mem. at 9.) Chen also argues specifically that evidence on the RICO counts will include past conduct by Chen for which he already has been charged, convicted, and sentenced, thus denying him the protections of the Double Jeopardy clause of the Fifth Amendment of the U.S. Constitution. (Chen Reply at 4.) Chen also argues that RICO counts expand the theory of liability that may be considered by the jury, which may result in confusing the jury and prejudicing Chen. (Chen Reply at 5.) The Government argues that Chen's role in the Ma Organization is related to the drug conspiracy and murders charged in Count Four, therefore, much of this evidence would be admissible even if Chen were to have a separate trial. (Gov. Mem. at 48.)

Defendant Ma, joined by Cai, also moves to sever his case pursuant to the Sixth Amendment's Confrontation Clause. (Ma Mem. at 26; Cai Mem. at 6-9; Cai Reply at 18.) Specifically, Ma contends that post-arrest statements made by Defendants Dao Nguyen and Chen directly implicate him, and because of the extensive nature of these statements, they cannot be redacted to

protect Ma's Sixth Amendment right of confrontation and cross-examination, therefore he is entitled to a separate trial from these Defendants.  (Ma Mem. at 26.)  Cai similarly argues that admitting Cai's co-Defendants' statements will violate the Confrontation Clause of the Sixth Amendment, even if their statements are redacted.  (Cai Mem. at 17.)  The Government argues that any prejudice arising from incriminating statements made by co-Defendants can be alleviated by redaction, pursuant to Bruton v. United States, 391 U.S. 123 (1968).  (Gov. Mem. at 38.)

The district court enjoys broad discretion in determining whether to sever a criminal proceeding, see, e.g., United States v. Locascio, 6 F.3d 924, 947 (2d Cir. 1993), and such a decision is, as the Second Court has noted, "virtually unreviewable." United States v. Lasanta, 978 F.2d 1300, 1306 (2d Cir. 1992).

Defendants seeking severance have a difficult standard to meet. As the Supreme Court has noted

> There is a preference in the federal system for joint trials of defendants who are indicted together.  Joint trials play a vital role in the criminal justice system. They promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts . . . .
>
> . . . a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants . . . .  Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant . . . .

When the risk of prejudice is high, a district court is
more likely to determine that separate trials are necessary,
but, . . . less drastic measures, such as limiting
instructions, often will suffice to cure any risk of
prejudice. . . .

[I]t is well settled that defendants are not entitled to
severance merely because they may have a better chance of
acquittal in separate trials.  Rules 8(b) and 14 are
designed to promote economy and efficiency and to avoid a
multiplicity of trials, [so long as] these objectives can be
achieved without substantial prejudice to the right of the
defendants to a fair trial.

**Zafiro v. United States**, 506 U.S. 534, 537-40 (1993)

(internal quotations and citations omitted).

Rule 14(a) of the Federal Rules of Criminal Procedure allows

the Court to grant a severance if joinder "appears to prejudice a

defendant or the government."  "A defendant seeking severance

must show that the prejudice to him from joinder is sufficiently

severe to outweigh the judicial economy that would be realized by

avoiding multiple length trials."  **Walker**, 142 F.3d 103, at 110.

"Joint trials involving defendants who are only marginally

involved alongside those heavily involved are constitutionally

permissible."  **Locascio**, 6 F.3d 924, 947; **see** **also** **United States**

**v. Carson**, 702 F.2d 351, 366-67 (2d Cir. 1983) (affirming court's

denial of severance motion despite the fact that defendant played

less prominent role in drug conspiracy charge and stating,

"differing levels of culpability and proof are inevitable in any

multi-defendant trial and, standing alone, are insufficient

grounds for separate trials."). The fact that evidence may be admitted against one defendant but not another does not necessarily require the granting of a severance motion. Id. at 367 (citing United States v. Losado, 674 F.2d 167, 171 (2d Cir. 1981)). Moreover, "[t]he fact that one of several codefendants is tried for a crime not committed by another codefendant does not, without more, create the sort of miscarriage of justice that would require a new trial." United States v. Hernandez, 85 F.3d 1023, 1029 (2d Cir. 1996).

In Bruton, 391 U.S. 123, the Supreme Court determined that a defendant is deprived of his Sixth Amendment rights when the Government introduces at a joint trial the confession of a nontestifying co-defendant which names another defendant as a participant in the crime. The rule announced in Bruton, however, is not absolute. The Supreme Court limited Bruton's reach in Richardson v. Marsh, 481 U.S. 200 (1987), where the Court explicitly stated that where "limited to facially incriminating confessions, Bruton can be complied with by redaction--a possibility suggested in that opinion itself." Richardson, 481 U.S. at 208-209 (citing Bruton, 391 U.S. at 134 n.10). For the redaction to be constitutionally sound, the Government must "eliminate not only the defendant's name, but any reference to his or her existence." Richardson, 481 U.S. at 211. Finally, the elimination of the defendant's name and existence must not be

partial but total.  In Gray v. Maryland, 523 U.S. 185 (1998), the Supreme Court found that the Sixth Amendment had been violated when the "State had simply replaced the nonconfessing defendant's name with a kind of symbol, namely, the word 'deleted' or a blank space with commas."  523 U.S. at 192.  This confession still referred to the "existence" of a nonconfessing defendant and was thus constitutionally infirm.  Id. at 193-95.  Finally, the redaction cannot distort the statement's meaning, purge substantially exculpatory information, or change the "tenor of the utterance as a whole."  United States v. Alvarado, 882 F.2d 645, 651 (2d Cir. 1989).

Defendants have failed to show how the fact that there may be more evidence incriminating certain co-Defendants than incriminating them, would result in a violation of Constitutional rights or a miscarriage of justice.  This is true particularly in light of the fact that the Defendants are charged in Count Four with double murder, which makes them more than marginally involved in the crimes alleged.  Also, the Government has indicated that a trial in this case would be at least two months, therefore, the time and expense of conducting separate trials for multiple Defendants would impose an extraordinary strain on judicial resources.  Further, this case is different from cases where the possibility of prejudicial spillover was raised after-the-fact.  In United States v. DiNome, 86 F.3d 277 (2d Cir.

1996), for example, the RICO charges were dismissed by the trial court, and the Second Circuit reversed the defendants' convictions on the remaining mail and wire fraud charges due to probable prejudice. Here, where the question of possible prejudicial spillover has been raised prior to trial, the Court will be able to ameliorate any undue prejudice with explicit and repeated jury charges. Any potential spillover prejudice that may occur will be corrected by the Court's instructions to the jury to consider each Defendant's guilt individually. Accordingly, in the interest of judicial economy and the lack of prejudice that would result in a joint trial, Defendants' motion to sever is DENIED.

As to the statements by co-Defendants, absent a redacted copy of the statements, the Court has no basis to determine whether any direct assertions of Defendants' participation in the charged crimes could be completely eliminated in accordance with Gray, Richardson, and Bruton. Further, at this stage of the proceedings, it is not clear that pre-trial resolutions by some Defendants will not obviate this problem altogether. Accordingly, this motion to sever is likewise DENIED.

### D. Motion for Bill of Particulars

Defendant Ma moves for an order directing the Government to file a bill of particulars, pursuant to Fed. R. Crim. P. 7(f). (Ma Mem. at 23.) Pursuant to Fed. R. Crim P. 7(f), and the Fifth and Sixth Amendments to the U.S. Constitution, Defendant Cai also moves for a bill of particulars, pertaining specifically to the narcotics conspiracy and distribution he allegedly participated in, as charged in Count Four of the Indictment. (Cai Mem. at 36-37.) The Government argues that all the Defendants possess enough information to understand the charges against them to prepare a defense, to avoid unfair surprise at trial, and to protect themselves against double jeopardy. (Gov. Mem. at 52.)

Rule 7(f) allows a defendant to seek a bill of particulars to:

> identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense. . . . Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required.

United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987); United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988) (stating same standard and noting that "[t]he principles governing requests for a bill of particulars are well settled").

"A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) (quoting United States v. Feola, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir. 1989)); see also United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999). As long as an indictment and discovery sufficiently enable a defendant to avoid surprise and prepare for trial, a bill of particulars is not warranted. See Torres, 901 F.2d at 233-234 (upholding district court's denial of a bill of particulars where the Government had provided "a wealth of evidentiary detail from the discovery to date, including electronic intercepts, search evidence and exhaustive supporting affidavits"); United States v. Rodriguez, No. 99 Cr. 367, 1999 U.S. Dist. LEXIS 15918, at *4, 1999 WL 820558 at *2 (S.D.N.Y. Oct. 13, 1999) (denying motion for a bill of particulars identifying known co-conspirators where the indictment coupled with discovery allowed a defendant "both to prepare his defense and to avoid prejudicial surprise at trial").

The Second Circuit and courts in the Southern District have routinely denied requests for bills of particulars concerning the "wheres, whens, and with whoms" of the crime. See, e.g., United States v. Mitlof, 165 F.Supp.2d 558, 569 (S.D.N.Y. 2001) (denying request for bill of particulars where defendant sought details of

the "wheres, whens and with whoms" that courts have held to be
beyond the scope of a bill of particulars) (citations omitted);
United States v. Bin Laden, 92 F. Supp. 2d 225, 242 (S.D.N.Y.
2000) (denying request for bill of particulars where the defense
sought detailed information on how the conspiracy was formed,
when each participant was alleged to have joined, and the "when,
where, how, and with whom" of the conspiracy); United States v.
Jimenez, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) (motions in
conspiracy cases for the "whens," "wheres," and "with whoms" are
routinely denied because the Government should not be compelled
to provide a preview of its evidence and give away its case
before trial).  Courts also deny bills of particulars seeking the
names and identities of unindicted co-conspirators where
sufficient discovery has been provided.  United States v. Trippe,
171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying bill of
particulars seeking names of all co-conspirators and aiders
and/or abettors in light of routine denial of such requests in
case law and the sufficiency of information contained in the
indictment and obtained through discovery).

    In deciding a motion for a bill of particulars, "[t]he
important question is whether the information sought is
necessary, not whether it is helpful."  United States v.
Facciolo, 753 F. Supp. 449 451 (S.D.N.Y. 1990).  Finally, the
granting of "a bill of particulars rests within the sound

discretion of the district court." United States v. Panza, 750
F.2d 1141, 1148 (2d Cir. 1984).

The 20-page Indictment advises Defendants, with sufficient
detail, of the illegal acts they have been charged with
committing, which, coupled with the discovery material the
Government already has provided to Defendants, including four
Complaints, and extensive documentary evidence and physical crime
scene evidence (see Gov. Mem. at 56-57), adequately enable them
to mount an adequate defense. Furthermore, the Government has
stated it will provide Defendants with § 3500 materials
sufficiently in advance of trial to prevent any prejudicial
surprise. Accordingly, Defendants' motion for a bill of
particulars is DENIED.


E. Motion for Audibility and Admissibility Hearing

Defendant Ma moves for a hearing to be conducted regarding
the admissibility and audibility of any recorded conversations
and the accuracy of any transcripts, pursuant to the factors
enumerated in United States v. Starks, 515 F.2d 112, 121 (3d Cir.
1975). (Ma Mem. at 21.) Ma also requests that the Court require
the Government to prove the admissibility of any tapes it intends
to use, as well as a foundation and transcript. (Ma Mem. at 22.)
The Government opposes the request as premature at this time, as

it has not yet determined which recordings it will introduce at trial, but attests that it will identify such audio evidence at least two weeks prior to trial, and will provide translations of any recordings that are in a foreign language. (Gov. Mem. at 59.)

The Government must "produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings." United States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir. 1991) (quoting United States v. Fuentes, 563 F.2d 527, 532 (2d Cir. 1977) (internal citations omitted); see also United States v. Arango-Correa, 851 F.2d 54, 58 (2d Cir. 1988). The Government shall produce audible tapes, transcripts and translations of all tapes it expects to use at trial at least three weeks prior to trial. Accordingly, Defendant's motion is DENIED.

F. Miscellaneous Motions for Discovery

1. Motion for Order Requiring Preservation of Notes

Defendant Ma moves for an order directing the Government to preserve the rough notes and/or reports of all Government agents who participated in the investigation of the instant case, including Government lawyers. (Ma Mem. at 13.) Defendant Cai also makes this motion, and specifically requests that notes from

Canadian law enforcement, and any other documents pertaining to
their investigation be provided to Defense counsel. (Cai Mem. at
21.) The Government opposes this motion, arguing that there is
no obligation under the Jencks Act for law enforcement officers
to retain rough notes when the contents of such notes are
incorporated into official records and they destroy the notes in
good faith. (Gov. Mem. at 60-61.) Furthermore, the Government
has acknowledged its obligation and intent to produce as prior
statements any notes of interviews of witnesses that are not
reflected in reports, pursuant to 18 U.S.C. § 3500. (Gov Mem. at
61, n.14.)

It is well established in the Second Circuit that Government
agents need not preserve rough notes "if the agents incorporate
them into formal reports." United States v. Elusma, 849 F.2d 76,
79 (2d Cir. 1988) (collecting cases); United States v. Terrell,
474 F.2d 872, 877 (2d Cir. 1973); see also United States v.
Blumhagen, No. 03-056, 2004 U.S. Dist. LEXIS 27422, at *7-8
(W.D.N.Y. Nov. 17, 2004). Despite the fact that some of the
crimes charged took place elsewhere, the Defendants are being
prosecuted in the Second Circuit, therefore, in light of Second
Circuit case law, and the Government's undertaking to turn over
any reports prior to trial, Defendants' motion for preservation
of rough notes is DENIED.

2. Motion for Disclosure of Co-Conspirators' Statements

Defendant Ma moves for an order directing the Government to disclose all alleged co-conspirator statements and additionally moves for the Court to conduct a hearing to determine the admissibility of such statements, pursuant to United States v. James, 590 F.2d 575, 581 (5th Cir. 1979). (Ma Mem. at 20.) The Government opposes the motion. (Gov. Mem. at 62.)

"In the Second Circuit, the functional equivalent of a James Hearing is provided by a Geaney ruling which occurs during trial and relies for its basis on the facts adduced at trial, including evidence received subject to a motion to strike at the close of the Government's case." United States v. Davidson, No. 92-CR-35, 1992 U.S. Dist. LEXIS 19434, *42, 1992 WL 402959, at *12 (N.D.N.Y. Dec. 16, 1992), aff'd, 33 F.3d 50 (2d Cir.), cert. denied, 513 U.S. 1166 (1995) (citing United States Feola, 651 F. Supp. 1068, 1129 (S.D.N.Y. 1987) and United States v. Geaney, 417 F.2d 1116 (2d Cir. 1969), cert. denied, 397 U.S. 1028 (1970)). Courts in the Second Circuit may admit co-conspirator statements at trial, subject to the Government's introduction of evidence that supports a finding that a conspiracy existed, that the defendant was part of the conspiracy, and that the statements made were done so during the course of and in furtherance of the conspiracy. See United States v. Tracy, 12 F.3d 1186, 1199 (2d

Cir. 1993); <u>United States v. Coffey</u>, 361 F. Supp. 2d 102, 124 (E.D.N.Y. 2005).

Based on the Second Circuit practice of courts issuing a <u>Geaney</u> ruling during trial, the Court DENIES Defendant Ma's motion for early disclosure of alleged co-conspirator statements. Additionally, the Court DENIES Ma's motion for a pretrial hearing regarding the admissibility of co-conspirator statements, as their admissibility will be determined by the Court during the course of the trial.

3. Motion for Early Production of Brady, Giglio, Jencks Act, Rule 404(b), and 3500 Material

The various Defendants move for early production of exculpatory material pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and <u>Giglio v. United States</u>, 405 U.S. 150 (1972), Jencks Act material, Rule 404(b) material, and 18 U.S.C. § 3500 material.[8] (Duc Nguyen Mem. at 2-8; Cai Mem. at 20-31; Ma Mem. at 8-17.) The Government argues that it is aware of its obligation to disclose exculpatory evidence in a timely fashion, and it has made a good-faith representation to the Court and counsel for Defendants that it has complied with its disclosure obligations.

_____

[8] Defendant Chen also moves for an order directing the Government to disclose certain exculpatory material specific to Chen. (Chen Mem. at 15-16.) The Government does not address this specific request in its opposition papers, and Chen does not raise it again in his Reply. The Government shall fulfill its <u>Brady</u> obligations to Defendant Chen, as well.

(Gov. Mem. at 63.)   The Government further attests that it intends to make Section 3500 material available to counsel "on a rolling basis beginning two weeks prior to trial, to be completed prior to the first day of trial" and it intends to provide all Rule 404(b) material to counsel two weeks prior to trial.   (Gov. Mem. at 64.)

It is well established that "the prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment."  United States v. Coppa, 267 F.3d 132, 135 (2d Cir. 2001) (citing Brady, 373 U.S. 83, at 87).  Such evidence "includes not only evidence that is exculpatory, i.e., going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, i.e., having the potential to alter the jury's assessment of the credibility of a significant prosecution witness."  United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998) (citing Giglio, 405 U.S. 150 and Napue v. Illinois, 360 U.S. 264 (1959)).  Courts often refer to exculpatory and impeachment evidence as Brady and Giglio material respectively.

The Government need not provide Brady and Giglio materials immediately; instead "as long as a defendant possesses Brady evidence in time for its effective use, the Government has not deprived the defendant of due process of law simply because it did not provide the evidence sooner."  Coppa, 267 F.3d 132, 144.

There are nevertheless some instances "where disclosure of exculpatory evidence for the first time at trial would be too late to enable the defendant to use it effectively in his own defense . . . ." Leka v. Portuondo, 257 F.3d 89, 101 (2d Cir. 2001) (quoting United States v. Cobb, 271 F. Supp. 159, 163 (S.D.N.Y. 1967)).

Federal Rule of Evidence 404(b) directs that "the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial" of an individual's other crimes or bad acts. Fed. R. Evid. 404(b). The Second Circuit has previously held that, with regard to such disclosures required by Rule 404(b), a period of four days may constitute reasonable notice in advance of trial. See United States v. Valenti, 60 F.3d 941, 945 (2d Cir. 1995).

The Court expects that the Government will continue to comply with all of its discovery obligations relating to exculpatory and impeachment material, as it has indicated it has already. Accordingly, the Government shall continue to provide Defendants with Brady material as discovered, and shall make all § 3500 material available on a rolling basis beginning two weeks before trial, and shall make all Rule 404(b) material available well before trial.

### 4. Motion for Early Expert Disclosure

Defendants Ma and Cai also request an order directing the Government to disclose immediately all expert testimony it intends to use at trial, including any reports or interview memoranda, pursuant to Fed. R. Ev. 702, 703, 705, to which they are entitled under Fed. R. Crim. P. 16(a)(1)(G).[9]  (Ma Mem. at 5; Cai Mem. at 19.)  The Government states it expects to make such disclosures at least two weeks prior to trial.  (Gov. Mem. at 64.)

The Advisory Committee Notes to the 1993 Amendment to Rule 16 state that, "With increased use of both scientific and nonscientific expert testimony, one of counsel's most basic discovery needs is to learn that an expert is expected to testify."  While no specific timing requirements are imposed, the Committee Notes also say that disclosures are expected to be made

---

[9] Fed. R. Crim. P. 16(a)(1)(G) states:

> At the defendant's request, the Government must give to the defendant a written summary of any testimony that the Government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. If the Government requests discovery under subdivision (b)(1)(C)(ii) and the defendant complies, the Government must, at the defendant's request, give to the defendant a written summary of testimony that the Government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial on the issue of the defendant's mental condition. The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

in a "timely fashion."  Accordingly, if the Government expects to use any expert witnesses at trial, the Government is DIRECTED to disclose them to Defendants no later than two weeks before trial.

   5. Other Discovery Motions

   Defendant Cai moves for an order directing the Government to provide Defendants with additional discovery, including autopsy reports and DNA reports.  (Cai Mem. at 19.)  Defendant Ma also moves for an order for the Government to disclose all evidence it intends to use at trial, including several categories of evidence under Fed. R. Crim. P. 16.  (Ma Mem. at 18-19.)  Defendant Ma moves for an order requiring the Government to provide all evidence it intends to use at trial, pursuant to Fed. R. Crim. P. 12(b)(4)(B).[10]  (Ma Mem. at 18.)  The Government contends again that it already has complied with all of its obligations under Rule 16, and "will continue to do so."  (Gov. Mem. at 65.)  In light of the Government's compliance with Rule 16, and promise to continue to do so, Defendants' motions are DENIED.

   Defendant Cai also renews his Application for Letters Rogatory to obtain information in Canada, which the Government does not oppose.  (Cai Mem. at 38.)  Counsel for Cai are directed

---

   [10] Fed. R. Crim. P. 12(b)(3)(B) states in part that a defendant may, "in order to have an opportunity to move to suppress evidence under Rule 12(b)(3)(C), request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16."

to submit to the Court a revised Application for Letters
Rogatory, within 30 days of the date of this Opinion, reflecting
the extent, if at all, that the Government has complied with
Cai's first application.


III. CONCLUSION

For the reasons stated above, all of Defendants' motions are
DENIED, with the exception of Defendant Dao Nguyen's motion for a
suppression hearing, which is GRANTED.

In the interests of justice, time already has been excluded
from the speedy trial clock until today's date, while the motions
were pending.  The Court finds that in the further interests of
justice, time is excluded until the hearing on April 11, 2006 at
11 a.m.  The Clerk of the Court is directed to docket the
attached letter brief from Dao Nguyen.

SO ORDERED.

DATED:    New York, New York
          March 20, 2006

Deborah a. Batts

Deborah A. Batts
United States District Judge